WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Joi N. Stirrup,

               Plaintiff,

v.

Education Management LLC, et al.,

               Defendants.

No. CV-13-01063-TUC-CRP

**ORDER**

The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. *See* 28 U.S.C. § 636(c).

Pending before the Court are: (1) Defendants' Motion to Compel Arbitration and Stay These Proceedings Pending Arbitration (Doc. 10); (2) Plaintiff's Combined Response to Motion to Compel Arbitration and Stay These Proceedings and Motion for Partial Summary Judgment (Doc. 12); and (3) Plaintiff's Second Motion for Partial Summary Judgment and Supplemental Response to Defendants' Motion to Compel Arbitration (Doc. 23). The parties have also filed supplemental briefing regarding newly decided cases. (Docs. 25, 26, 31, 32). On August 11, 2014, the pending motions came on for oral argument. For the following reasons, the Court denies Defendants' Motion to Compel Arbitration and Stay These Proceedings Pending Arbitration and denies Plaintiff's Motions for Partial Summary Judgment.

**BACKGROUND**

Plaintiff Joi Stirrup alleges discrimination in the form of constructive discharge from her employment in violation of the False Claims Act, 31 U.S.C. § 3730(h), and

wrongful termination in violation of A.R.S. § 23-1501(A)(3)(c)(i),(ii).  (Complaint (Doc. 1), ¶6).   Stirrup alleges that she had been employed by Defendants Education Management, LLC, and Education Management Corporation (collectively referred to as "EM") from December 2008 until the date of her constructive discharge in May 2013.  (*Id.* at ¶¶1-5, 10).  At the time of her discharge, Stirrup was employed as the registrar at The Art Institute of Tucson ("AiTU"), which is owned and managed by EM. (*Id.* at ¶¶5, 11).

Stirrup alleges that while working at AiTU, she came to suspect that EM was not documenting or reporting the cancellations of newly enrolled students in order to keep: (1) tuition payments from lenders whose loans were insured by the U.S. government and/or (2) the students' Pell grant funds; and/or (3) benefits paid for the students by the Department of Veterans Affairs or the Arizona Department of Economic Security, "all…of which EM was not entitled to receive or keep when a student timely exercised their right of cancellation." (*Id.* at ¶13). Stirrup further alleges that failure to report that a student withdrew, unlawfully increased the amount of federal and state funding EM received.  (*Id.* at ¶15; *see also id.* at ¶¶ 18, 19 (citing two alleged instances of such conduct that Stirrup learned about in February 2013)).  Stirrup also alleges that EM overstated "the schedules or case loads of some AiTU students in order to obtain more federally insured tuition money and federally funded Pell grants."  (*Id.* at ¶17),

Stirrup alleges that she spoke to superiors about correcting records regarding the conduct described above.  (*Id.* at ¶20).  Stirrup alleges that her superiors denied wrongdoing and acted toward her with "hostility, which increased to the point where her working conditions became intolerable by May 14, 2013, and she was compelled to resign on that day."  (*Id.*; *see also id.* at ¶21 (describing alleged retaliatory conduct)).

**DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY THESE PROCEEDINGS PENDING ARBITRATION AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

EM seeks to compel arbitration of Stirrup's claims and to stay these proceedings

pending arbitration.  EM argues that in October 2012, Stirrup agreed, pursuant to EM's "Alternative Dispute Resolution Policy" ("ADR Policy"), to arbitrate claims of employment discrimination, harassment, retaliation, or wrongful termination.   (Doc. 10, p.1).

In Response, Stirrup filed a combined Opposition to Defendants' Motion and a Motion for Partial Summary Judgment ("MPSJ").  (Doc. 12).  Stirrup asserts that she never entered into an arbitration agreement with EM and she was not aware of the ADR Policy until August 2013, several months after her constructive discharge.  (MPSJ, p. 3).

After the Motion to Compel Arbitration and MPSJ were briefed, the Ninth Circuit decided *Davis v. Nordstrom, Inc.,* 755 F.3d 1089 (9th Cir. 2014) and the Court requested supplemental briefing in light of *Davis.*   (*See* Docs. 22, 25, 26).   After oral argument, Stirrup filed a notice of Supplemental Authority Re First Motion for Partial Summary Judgment (Doc. 31), discussing the recent Ninth Circuit decision in *Nguyen v. Barnes & Noble, Inc.,* __ F.3d. __, 2014 WL 4056549 (9th Cir. Aug. 18, 2014), and EM filed a Response to Plaintiff's Supplemental Authority (Doc. 32).

STANDARD

"The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et seq.* reflects a 'liberal policy in favor of arbitration.'"  *Davis*, 755 F.3d at 1092 (quoting *AT&T Mobility LLC v. Concepcion,* __ U.S. __, 131 S.Ct. 1740 (2011)). It is well-settled that "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [s]he has not agreed so to submit.'"  *Samson v. Nama Holdings, LLC,* 637 F.3d 915, 923 (9th Cir. 2011) (quoting *Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 83 (2002)); *see also Davis,* 755 F.3d at 1092 (a contract to arbitrate will not be inferred absent a clear agreement).  Further, the "district 'court's role under the [FAA]…is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Samson,* 637 F.3d at 923-24 (quoting *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir.2000)).

"A motion to compel arbitration is decided according to the standard used by district courts in resolving summary judgment motions pursuant to Rule 56. Fed.R.Civ.P." *Coup v. The Scottsdale Plaza Resort, LLC,* 823 F.Supp.2d 931, 939 (D. Ariz. 2011) (citations omitted).  "'If there is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury.'"  *Id.* (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir.1991)). Thus, "'[o]nly when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.'" *Id.* (*quoting Three Valleys,* 925 F.2d at 1141); *see also Interbras Cayman Co. v. Orient Victory Shipping, Co.,* 663 F.2d 4, 7 (2d Cir. 1981) ("To make a genuine issue entitling the plaintiff to a trial by jury, an unequivocal denial that the agreement had been made was needed, and some evidence should have been produced to substantiate the denial.").  Where there is a question of fact, and the party alleged to be in default of the arbitration agreement requests a jury trial, the matter shall be decided by jury.  *See* 9 U.S.C. § 4; *see also Simpson v. Inter-Con Security Sys., Inc.,*  2013 WL 1966145 (W.D. Wash. May 10, 2013) (the court decides the question of whether the parties agreed to arbitrate on summary judgment if there is no dispute of material fact, otherwise the court conducts a jury or bench trial).[1]

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party's evidence is presumed true and all inferences are to be drawn in the light most favorable to that party.  *Eisenberg v. Insurance Co. of North Amer.,* 815 F.2d 1285, 1289 (9th Cir. 1987).

---

[1] Stirrup has requested a jury trial of the claims underlying her complaint and she has requested a jury trial on the issue whether there is a valid arbitration agreement. (Doc.1; Doc. 12, p. 15).

Only disputes over facts that might affect the outcome of the suit will prevent the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, if the record taken as a whole "could not lead a rational trier of fact to find for the nonmoving party," summary judgment is warranted. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir.2006) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). If the burden of persuasion at trial would be on the nonmoving party, the movant may carry its initial burden of production under Rule 56(c) by producing, "evidence negating an essential element of the nonmoving party's claim or defense…," or by showing, after suitable discovery, that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105-1106 (9th Cir. 2000).

Because the summary judgment standard applies to the parties' respective motions, the Court, in essence, is resolving cross-motions for summary judgment. The Ninth Circuit instructs that "[w]hen parties file cross-motions for summary judgment, we consider each motion on its merits. *American Tower Corp. v. City of San Diego*, __ F.3d. __, 2014 WL 3953765, *3 (9th Cir. Aug. 14, 2014) (citing *Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir. 2001)). Further, "the district court [is] required to review the evidence properly submitted in support of [plaintiff's cross-motion for summary judgment] as to determine whether [plaintiff] presented an issue of material fact precluding summary judgment in favor of Defendants." *Fair Housing Council of Riverside County, Inc.,* 249 F.3d at 1135 (footnote omitted); *see also id.* at 1134 ("We hold that, when simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."); *Walters v. Odyssey Healthcare Management Long Term Disability Plan,* 2014 WL 4371284, *3 (D. Ariz. Sept. 4, 2014) ("when multiple parties submit cross-motions for summary judgment, the Court considers each

motion on its own merits but must consider all of the evidence presented in determining whether a genuine issue of material fact exists.").

EVIDENCE BEFORE THE COURT.  On October 3, 2012, almost 4 years after Plaintiff began employment with EM, an e-mail was sent to employees notifying them of the adoption of the ADR Policy and providing a link to the Policy as follows:

> [EM] has implemented an Alternative Dispute Resolution Policy[2] to promptly and fairly address all work-related disputes. This new policy is being distributed to all employees and allows for both informal and formal avenues for resolving concerns. This Policy is a term and condition of your continued employment with [EM] Please click here to access the ADR Policy.
>
> Please acknowledge by clicking here that you received, reviewed and agree to comply with the Alternative Dispute Resolution Policy. Questions regarding the Alternative Dispute Resolution Policy should be directed to your appropriate Human Resources or Employee Relations Representative.

(Doc. 10, p. 3 (quoting Exh. 2, ¶3) (underline in original); see also Doc. 10, Exh. 1, ¶4 (Vice President of Employee Relations Trisha Earls stating that on October 3, 2012, Stirrup received an e-mail with the language set out above)).  EM submitted a declaration from August Thalman IV, the software engineer who wrote the program to distribute the e-mail[3], explaining the steps to enter acceptance of the ADR Policy, which included that: "Plaintiff clicked on the link in the…e-mail and was taken to a login Screen[]" which required Plaintiff "to affirmatively enter her unique Username and Password[4] in order to enter the 'Alternative Dispute Resolution Policy Acceptance' page." (Doc. 10, Exh. 2, ¶4 & internal exh. A). Thereafter, she had to click the "accept" button to show her agreement

---

[2]  The ADR Policy provides in relevant part that:  "Accepting or continuing employment with the Company after receipt of this Policy constitutes agreement to abide by its terms."  (Doc. 10, p. 2 (quoting Exh. 1, ¶3 (internal exh. A)).

[3]  At oral argument, Plaintiff's counsel stated that Stirrup did not dispute that Thalman wrote a program that sent out the e-mail.

[4]  Stirrup was required to change her unique password every 90 days.  Thalman states that prior to October 3, 2012, Stirrup "last reset her password on July 30, 2012 using the same Username and IP address she used to accept the ADR [P]olicy."  (Doc. 10, Exh. 2, ¶8).

to the ADR Policy,[5] and she would then be taken to "the Alternative Dispute Resolution Policy Acceptance Summary Screen" which informed: "Your acceptance has been successfully recorded." (*Id.* at ¶¶5-6). Thalman attaches to his declaration "shots" of computer screens which he says show: (1) Stirrup entered her unique user name and password into the ADR Policy Acceptance page on October 3, 2012; (2) Stirrup checked the box indicating she accepted and agreed to the ADR Policy (Doc. 10, Exh. 2 (internal exh. B)); (3) Stirrup viewed the ADR Policy Acceptance Summary Screen (Doc. 10, Exh. 2 (internal exh. C)). (Doc. 10, Exh. 2, ¶¶4-6). Thalman also attaches a screen shot which he identifies as a "Result Message" confirming that Stirrup, identified as Employee Profile Number 85884, accepted the ADR Policy on October 3[6], 2012 at 16:07 (4:07 p.m.). (*Id.* at ¶7 & internal exh. D). Thalman states that all the above were completed using the IP address assigned to the network at AiTU where Stirrup's work computer is located. (*Id.* at ¶9). "When Plaintiff electronically accepted the ADR [P]olicy, a record of her acceptance was automatically entered into a secure database[]" that could only be altered by the employee's use of the application. (*Id.* at ¶10). The secure database is password protected and maintained exclusively by EM's Information Technology Department. (*Id.*). No one

---

[5] The Acceptance Screen includes the following language:

> [EM] has implemented an Alternative Dispute Resolution Policy to promptly and fairly address all work-related disputes. This policy allows for both informal and formal avenues for resolving concerns. Please click here to access the Alternative Dispute Resolution Policy. This Policy is a term and condition of your continued employment with [EM].

> By clicking below, I agree to abide by the terms of the Alternative Dispute Resolution Policy. I agree that if I have any dispute with the Company arising out of my employment, I will use the Company's Alternative Dispute Resolution Policy as the exclusive means for resolving such dispute. I further acknowledge that I have been given the opportunity to review the terms of the Company's Alternative Dispute Resolution Policy, as well as the opportunity to have any questions about that Policy answered.

(Doc. 10, Exh. 2, (internal exh. B)).

[6] Thalman's declaration actually states that the "Result Message" was dated October 10, 2012, however, EM asserts that reference to October 10, 2012 was a typographical error and Thalman's declaration should instead read that the Result Message was dated October 3, 2012. EM points out that the screen shot referenced by Thalman reflects an October 3, 2012 date stamp. (Reply (Doc. 18), p. 6 n.1).

at AiTU has such access. (*Id.*).  No one has requested or received access to change any such information regarding Stirrup.  (*Id.*).  Thalman also states that Stirrup received the October 3, 2012 e-mail.  (*Id.* at ¶3).

Brian Castle, EM's Database Services Manager reaffirms Thalman's statements concerning communications received from Stirrup's unique user name, password, and IP address, and that no one could alter the secure database containing the October 3, 2012 information recorded from Stirrup's computer unless that person had approval from two different people and no such approval was sought.  (Doc. 18, Exh. 4, ¶¶1, 4, 5).

EM also submits a declaration from Linda Hunter, Vice President of Human Resources for the Art Institutes, stating that on January 11, 2013, an e-mail entitled "Updates to Handbook and HR Policies" was sent to all employee e-mail addresses. (Defendants' Reply in Support of Motion to Compel Arbitration and Stay of Proceedings and Response to MPSJ (Doc. 18), Exh. 2, ¶10).  The e-mail stated:  "'Pleased be advised that the documents listed below have recently been updated.'  It then instructed all employees to 'Please take the time to review the revised content.'  The 'documents listed below' included 'Employee Handbook (revision date, December 2012)[]" and the e-mail contained a link to the revised Employee Handbook which "linked to the e-mail contained [sic] [EM's] recently implemented [ADR] Policy as pages 20 through 24 of the Handbook." (*Id.* at ¶¶11, 13, 14).[7]

Stirrup submits her sworn declaration statement that she never received "any notification at any time or in any way during my employment that EM had implemented or added or imposed any"…ADR Policy and if she had, she would not have assented to it but would have instead resigned.  (Plaintiff's Statement of Facts ("SOF") (Doc. 11), Exh. 1, ¶¶8-10; see also *id.* ¶9).  Stirrup explains her rationale for resigning from a job she has held since 2008, rather than agreeing to arbitration, as follows:

---

[7] The ADR Policy beginning at p. 20 of the Employee Handbook cited by Hunter indicates the Policy applies to individuals who, *inter alia,* were "employed on or after the Effective Date of this Policy."  (Doc. 18, Exh. 2 (internal exh. D at pp. 20-24)).

- 8 -

> I have a masters [sic] degree in management and would be very concerned about any limitations upon legal rights I would have in the event of any dispute with my employer.  It's common knowledge in the business world that employers try to force their employees to give up their rights to file lawsuits when their legal rights are violated, and divert them into private non-judicial arbitration where employees' [sic] rarely prevail because the employers are regular "repeat customers" for the private arbitration companies, and if the arbitration companies don't favor their "regular customers" with favorable results, their customers will go elsewhere, to some competing arbitration company.  One only need look at the fee schedules charged by arbitration companies, particularly the AAA Employment Dispute Rules.  These very high fees provide great income for the arbitration companies, which have minimal overhead….
> ***
> If I had been notified of the [ADR Policy]…at any time before I was constructively discharged in May, 2013, I would not have assented to or worked subject to such an [ADR Policy].  If it was imposed upon me on a "take it or leave it basis", I would have resigned, particularly since in October 2012, when it was supposedly transmitted to EM employees, I was already suspicious about possible illegal activities at EM and the consequences to me of doing something about such activities.

(Doc. 11, Exh. 1, ¶¶9-10).

Stirrup states she has never seen the computer screens that were submitted with EM's Exhibits.  (*Id.* at ¶11).  Stirrup also rebuts EM's statement that she received and/or acknowledged notice of the ADR Policy on Wednesday, October 3, 2012 at 4:07 p.m., by pointing out that she was not at her desk at that time:

> [T]hat week was the first week of the new quarter at AiTU, and I recall with certainty that I was away from my office and computer that afternoon, well before and well after 4pm, because my duties were to go to each classroom that afternoon to personally verify attendance in every single class.

(*Id.,* Exh. 1, ¶4).[8]

---

[8] Attached to Plaintiff's Reply to Response to Her Motion for Partial Summary Judgment (Doc. 20) are:  (1) the "Second Declaration of Plaintiff Joi N. Stirrup"; and (2) the Sworn Declaration of Sean Baker, who worked at AiTU as an IT specialist from July 2012 to December 2012.  (Doc. 20, Exhs. 1, 2).  "Ordinarily, a district court will not consider evidence in the context of a motion for summary judgment that is submitted for the first time in reply. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.1996) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond") (internal alteration and quotation marks omitted)."  *Head v. Kommandit-*

Stirrup also denies receiving an e-mail regarding the ADR Policy on January 11, 2013 as alleged in Hunter's declaration. (Doc. 20, Exh. 1, ¶5). Stirrup stresses that during her employment, she "read every e-mail I received because all such business communications were important to me and part of my duties." (*Id.* at ¶12). Further, the only employee handbook Stirrup was ever given was revised May, 2011 and she has never before seen the version of the employee handbook attached to EM's Response. (*Id.* at ¶¶10-11).

Stirrup asserts that her password information was known to all EM IT employees including Thalman and Stacy Genchie, who is the EM Regional IT Director and who used Stirrup's password information when attempting to correct a software issue. (Doc. 11, Exh. 1, ¶12), and "the new [Art Institute] IT female employee (whose name I do not recall, who assumed her job shortly before I left [in May 2013]) told me to write my password down (during my last 2 weeks), because the AiTU Director (CEO) Ralph William Van Zwol III wanted me to use a laptop instead of my desktop. I did as instructed and my password/log-in information was there for anyone to see in plain view at my workstation." (*Id.*). Stirrup also submits a declaration from AiTU IT specialist and co-worker Sean Baker that employees have given him and other IT technicians their passwords to resolve equipment issues, and he recalls asking Plaintiff "at one point in time…" for her password for work purposes and she supplied it. (Doc. 20, Exh. 2, ¶¶6-

---

*Gesellschaft MS San Alvaro Offen Reederei GMBH & Co.,* __ F.3d. __, 2014 WL 688645, *6 n.11 (W.D. Wash. Feb. 21, 2014). Since the filing of Stirrup's Reply and additional exhibits, the parties have briefed Plaintiff's Second Motion for Partial Summary Judgment and have filed supplemental memoranda regarding recently decided cases. At no time has EM objected to Stirrup's submission of the additional declarations or requested leave to file a sur-reply or additional evidence in response. "[B]y failing to object to or otherwise challenge the introduction of the [evidence submitted in reply] in the district court, [the non-moving party has] waived any challenge on the admissibility of th[e] evidence." *Getz v. Boeing Co.,* 654 F.3d 852, 868 (9th Cir. 2011); *see also Head,* __ F.3d. at __, 2014 WL 688645 at*6 n.11 ("Because [plaintiff] has not objected to [defendant's] introduction of an additional declaration in reply, the court may in its discretion consider this evidence when deciding [defendant's] motion for summary judgment."). Given that EM has seen no reason to object to the submission of additional declarations with Stirrup's Reply, the Court will exercise its discretion to consider this evidence in resolving the pending motions. *See id.*

7).  Further, there is no formal process for requesting and receiving such passwords.  (*Id.*at ¶6).

**DISCUSSION.**

      At the outset, the Court addresses Stirrup's challenges to the documents attached at A through C to Thalman's declaration and upon which EM relies to support its position that Stirrup received and assented to the ADR Policy.  (Doc. 12, pp. 5-9).  According to Stirrup, the exhibits "are basically blank screens or views that depict absolutely nothing." (*Id.* at p. 7).  Stirrup further argues that the declarations submitted by Thalman and Earls lack foundation and are hearsay given that they "offer no proof as to how either Declarant would know for certain…" that Stirrup received the e-mail, especially given that "[n]either Declarant alleges they were present with Stirrup when such e-mail(s) were sent or received…."  (*Id.* at p. 8).

      Stirrup's argument is well-taken with regard to Earls' Declaration.  Earls, who states that she was responsible for assisting all of the EM "schools in rolling out the ADR Policy to all existing employees" (Doc. 10, Exh. 1, ¶2), does not provide any basis whatsoever to support her statement at paragraph 4 of her declaration that Stirrup received the October 3, 2012 e-mail, and the Court will not consider this statement.

      Thalman, on the other hand, states that he personally wrote the program that sent the "bulk e[-]mail to employees of the Art Institute…", including Stirrup, on October 3, 2012. (*Id.*, Exh 2, ¶3).  While the screen shots attached to Thalman's Declaration may require some explanation, Thalman's Declaration does just that.  He also avows that the screen shots he references are true and accurate.  (*Id.* at ¶¶ 4-7).  Moreover, EM also submits the Declaration of Database Services Manager Brian Castle confirming that "the record reflecting Ms. Stirrup's agreement to the ADR Policy was submitted using her unique Username and Password from [her assigned] IP address….[T]he record has not been changed since it was recorded and stored in the secure database on October 3, 2012 at 4:07 p.m. and I can confirm that the record is a true and accurate reflection of the record submitted utilizing Ms. Stirrup's unique Username and Password from [her assigned] IP address…."  (Doc. 18, Exh.4, ¶¶4-5)).

With regard to summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Rule 56.  *Celotex,* 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").  Plaintiff does not argue that the screen shots "cannot be presented in a form that would be admissible in evidence."  Fed.R.Civ.P. 56(c)(2).  A fair reading of Thalman's and Castle's declarations supports the conclusion that the records submitted qualify as business records falling within the hearsay exception at Fed.R.Evid. 803(6).  *See e.g. U-Haul Intern., Inc. v. Lumbermens Mut. Cas. Co,* 576 F.3d 1040, 1043-45 (9th Cir. 2009) (citations omitted).  Further, Fed.R.Evid. 901 "states that for authentication there must be 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *United States v. Workinger,* 90 F.3d 1409, 1415 (9th Cir 1996).  "A document can be authenticated by the testimony of a witness with knowledge."  *Id.* (citation omitted).  The proponent of the evidence "need only make a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.'" *Id.* (quoting *United States v. Chu Kong Yin*, 935 F.2d 990, 996 (9th Cir.1991)). "Once the prima facie case for authenticity is met, the probative value of the evidence is a matter for the jury." *Id.*  Knowledge may be inferred from a declarant's professional position.  *In re Kaypro,* 218 F.3d 1070, 1075 (9th Cir. 2000). On the instant record, Thalman's declaration and attached screen shots are properly considered in resolving the pending motions.  However, Thalman's statements that Stirrup received the e-mail and/or that she was the person who clicked on the various links and accept box are unsupported.  Thalman only has knowledge that someone using Stirrup's username and password made the entries from the IP address assigned to AiTU where Stirrup's work computer was located, and the Court considers Thalman's statements mindful of this limitation.

**EM's Motion to Compel Arbitration.**  EM argues that Stirrup has not established a question of fact as to whether she assented to the ADR Policy.  According to EM, arbitration is mandated by the fact that Stirrup continued working at AiTU after the

October 2012 notification to employees about implementation of the ADR Policy.  (Doc. 18, p. 3[9]).  To support this position, EM relies heavily on a decision from this District in *EEOC v. Cheesecake Factory,* 2009 WL 1259359 (D. Ariz. May 6, 2009).  In *Cheesecake Factory,* the court recognized that: "'At-will employment contracts are unilateral and typically start with an employer's offer of a wage in exchange for work performed; subsequent performance by the employee provides consideration to create the contract.'" *Cheesecake Factory,* 2009 WL 1259359, at *4 (quoting *Demasse v. ITT Corp.,* 194 Ariz. 500, 984 P.2d 1138, 1142-43 (Ariz.1999)).  Moreover, because an at-will employment relationship can be modified at any time, the employer has the right to change the arbitration agreement and exercising that right would merely create a new offer of employment for the future, and the employee may accept that new offer by performance— i.e., continuing to work for the employer.  *Id.* (citations omitted); *see also Davis,* 755 F.3d at 1094 (under California[10] law, where an employee continues in his or her employment after being given notice of the changed terms or conditions, she has accepted those new terms or conditions).  EM also relies on *Cheesecake Factory* for the premise that there is no requirement that the employee affirmatively assent to the arbitration policy.  However, EM overlooks that *Cheesecake Factory* did not involve the question whether the employees had *notice* of such policy.  In *Cheesecake Factory,* the employees signed a two-page document stating they had received the employee handbook and initialed paragraphs about the arbitration policy.  Instead, the issue in *Cheesecake Factory,* concerned whether the arbitration agreement was unconscionable.  Likewise, *Batiste v. U.S. Veterans Initiative,* 2012 WL 300729, *1 (D. Ariz. Feb. 1, 2012), also cited by EM for premise that the employee did not have to assent to the arbitration policy, is distinguishable because although it is not clear whether employee signed any agreement containing the arbitration

---

[9] Reference to page numbers correlate to the page number assigned by the CM/ECF System appearing at the top of each page of Doc. 18.

[10] Stirrup has not disputed EM's assertion that "[t]here is no meaningful difference between the Arizona state contract law principles applicable in this case and the California state contract law principles applied by the *Davis* court."  (Supplemental Brief (Doc. 25), p. 2)

provision, there was no dispute that he read the Employee Handbook containing the mandatory arbitration provision.

EM also argues that even if Stirrup "failed to read…[the October 2012 and January 2013[11]] e-mails, their distribution to Plaintiff is sufficient to bind her."  (Doc. 18, pp. 9-10) (citing *Coup,* 823 F.Supp.2d 931 (citing *Darner Motor Sales Inc. v. Universal Underwriters Insur. Co.,* 140 Ariz. 383, 394, 682 P.2d 388, 399 (Ariz. 1984)); *Ellerbee v. GameStop, Inc.,* 604 F.Supp.2d 349, 354 (D. Mass. 2009)).  However, it was undisputed in *Coup* and  *Ellerbee* that the respective plaintiffs received notice of the arbitration policy. *See e.g. Coup,* 823 F.Supp.2d at 949 ("there is no evidence that Plaintiffs' were not given a copy of [defendant's] arbitration procedures...").  Instead, the issue in *Coup* involved the plaintiffs' failure to read the employee manual containing the arbitration policy and the employer's alleged failure to provide adequate time to do so.  *Id.*  Likewise, in *Ellerbee,* the issue did not involve whether the plaintiffs received notice of the policy, but rather whether their refusal to sign the rules prevented the plaintiffs from being bound by the arbitration policy.  *Ellerbee,* 604 F.Supp. 2d at 355.  Unlike the plaintiffs in *Coup* and *Ellerbee* who did not dispute that they received the arbitration policy, Stirrup denies that she received the ADR Policy at issue.  As such, *Coup* and *Ellerbee* are inapposite.

In contrast to cases cited by EM where the parties had in fact received the arbitration policy, the issue here is whether Stirrup had notice of the ADR Policy.  In *Davis,* the Ninth Circuit determined that under California law, the employer was required

---

[11] EM's distribution of the January 2013 e-mail notice about the "Update to Handbook and HR Policies" (Doc. 18, Exh. 2, ¶10), alone, (*i.e.,* without prior notice of the ADR Policy), is not sufficient to bind Stirrup.  Nothing in the content of the e-mail alerted employees about implementation of the ADR Policy, which modified the conditions of their at-will employment.  *See e.g. Davis,* 755 F.3d. at 1092-93 (finding sufficient notice where a letter was sent to employees informing them about the modification and where a copy of the dispute resolution policy, including a copy of the arbitration provision, was enclosed). Moreover, in light of the steps EM took to inform employees of implementation of the ADR Policy in October 2012, EM's argument that the January 2013 e-mail constituted sufficient notice fails.

to provide employees with "reasonable notice" of the modification.[12]  *Davis,* 755 F.3d at 1093 (also noting that if an employer has a prescribed method of notice of modification, it is incumbent upon the employer to follow such method).  The *Davis* court held that the employer "satisfied the minimal requirements under California law for providing employees with reasonable notice of a change to its employee handbook by sending a letter to…" the employees informing them of the modification, *id.* at 1094, together with "a copy of the entire Dispute Resolution Program, including the arbitration provision."  *Id.* at 1092 (also holding that under California law the employer was not required to inform the employee that continued employment constituted their assent to the arbitration provisions).

EM argues that Stirrup presents nothing but speculation to support her opposition to the Motion to Compel Arbitration.  Although Stirrup states that Thalman and Genchie had access to her password information, she does not specify when they had such access.  She submits an affidavit from EM IT specialist Baker that during his employment at AiTU from July 2012 to December 2012, employees including Stirrup gave him their passwords to resolve computer issues.  She also states that during her last two weeks of employment in May 2013, she was required to write her password down and her "password/log-in information was there for anyone to see in plain view at my work station."  (Doc. 11, Exh. 1, ¶12).  Of course, this latter instance occurred after October 3, 2012 and, thus, is irrelevant to the matter at hand.  Even assuming that Thalman and Genchie or other IT employees, like Baker, had access to Stirrup's password information during the relevant time, Stirrup provides no rationale whatsoever as to why one of them would have accessed her e-mail on October 3, 2012 and accepted the ADR Policy.  "Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence…."  *Matsushita,* 475 U.S. at 596.  Although Stirrup states in her declaration that by October 2012 she had suspicions "about possible illegal activities" at EM (Doc. 11, Exh. 1, ¶10), she does not cite any instances of such alleged illegal activity occurring until 2013 (*see*

---

[12]  The parties do not dispute that there is no meaningful difference between California law discussed in *Davis* and Arizona law.

Doc. 1 at ¶¶18-19), and she does not allege or state that she reported her suspicions to her superiors close in time to October 3, 2012.

However, speculation based on circumstantial evidence that someone else who had access to her computer login information might have entered her assent to the ADR Policy on October 3, 2012 is not all that Stirrup offers.  She also submits her declaration that she "never received any notification at any time or in any way during my employment that EM had implemented or added or imposed any…" ADR Policy.  (Doc. 11, Exh. 1, ¶8; *see also id.* at ¶6 ("The first time [Stirrup] ever knew of or heard of the…" ADR Policy was after she had left EM's employ)).  Stirrup also states that she would not have assented to the ADR Policy in October 2012 because of her belief that arbitration favors employers and because by that time she had suspicions about possible illegal activity at EM and the consequences she might face if she reported it.  (*Id.* at ¶¶9-10).  She also states that she was not at her computer at the time when Thalman says she responded to the e-mail.  (*See* Doc. 20, Exh. 1, ¶4).

EM argues that "[w]hile Plaintiff's self-serving statements do establish that Plaintiff is willing to swear to absolutely anything in an effort to further her position in this litigation, they do not create a genuine dispute as to whether Plaintiff is bound by the ADR Policy.  No reasonable fact-finder would credit Plaintiff's self-serving after-the-fact fictional account in the face of EM[]'s substantial objective evidence establishing that, on October 3, 2012, she acknowledged receipt of the ADR Policy." (Doc. 18, p. 7).  Defendant overlooks "the long-standing rule that credibility may not be resolved by summary judgment…."  *McLaughlin v. Liu,* 849 F.2d 1205, 1207 (9th Cir. 1988) (citing *Anderson,* 477 U.S. at 255).  Stirrup's statements that she did not receive the e-mail, was never notified about the ADR Policy, and was away from her computer at the relevant time are "direct evidence of the central fact in dispute.  [Stirrup] does not ask that inferences be drawn in [her] favor, but that [her] testimony be taken as true."  *Id.* at 1208.  As the respondent to EM's Motion, Stirrup's evidence is to be believed.  *Leslie v. Groupo, ICA,* 198 F.3d 1152, 1157 (9th Cir. 1999).  Thus, the Ninth Circuit has "specifically rejected the notion that a court could disregard direct evidence on the ground that no

reasonable jury would believe it." *Id.* at 1159 (citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.,* 809 F.2d 626, 631 n.3 (9th Cir. 1987)); *see also McLaughlin,* 849 F.2d at 1208 ("We have upheld summary judgment on the basis of *Matsushita's* 'implausibility' standard only where the non-movant relied on inferences from circumstantial evidence.") (footnote omitted).  "If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party.  The nonmoving party's evidence must be taken as true." *T.W. Elec. Contractors Ass'n.,* 809 F.2d at 631.

EM's argument that Stirrup's statements are self-serving is unavailing.  *See United States v. Shumway,* 199 F.3d 1093, 1104 (9th Cir. 1999) (stating plaintiff's "affidavit was of course 'self-serving,'….[a]nd properly so, because otherwise there would be no point in his submitting it" when reversing entry of summary judgment against plaintiff where district court rejected affidavit as self-serving).  "That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *Id.*  Further, "[i]f the affidavit stated only conclusions, and not 'such facts as would be admissible in evidence,' then it would be too conclusory to be cognizable, but…", *id.* (footnote omitted), here Stirrup does state material facts based on her personal knowledge.

EM also attempts to undermine Stirrup's credibility and ability to accurately remember events by challenging Stirrup's statement that in May or June of 2013, EM Human Resources Manager Shannon Fulmer e-mailed her a copy of the employee handbook, "and the handbook said nothing about any arbitration process or the…" ADR Policy.  (Doc. 11, Exh. 1, ¶16).  EM submits Fulmer's declaration denying Stirrup's statement that Fulmer e-mailed Stirrup the employee handbook; instead, Fulmer states she sent the Code of Conduct, which referenced EM's non-retaliation policy.  (Doc. 18, Exh. 3, ¶5; *see also id.* internal Exh. A (e-mail correspondence from Fulmer to Stirrup)).  EM argues that if Stirrup "misrepresents to this Court the document she received in May 2013, just a few months prior to filing her Complaint, one must question her ability to credibly

represent to this Court that she never received the October 3, 2012 e-mail…" notifying her of the ADR Policy.  (Doc. 18, p. 5).

"It is for the trier of fact to determine the credibility of plaintiff's testimony." *LaMarr v. American Bankers Life Assurance Co.,* 2006 WL 1160098, *2 (D. Ariz. May 1, 2006) (denying summary judgment where plaintiff submitted statements that he never received the information that would have put him on notice of insurance policy's limitations).  Because Stirrup's sworn statements constitute direct evidence of a material fact, Stirrup has satisfied her burden as the respondent to EM's Motion to Compel Arbitration by pointing to evidence that creates a genuine issue of material fact.  *See e.g. Id.; McLaughlin,* 849 F.2d at 1209 ("Because [defendant's] sworn statement…was direct evidence of a material fact…the district court erred in grating summary judgment…." in favor of plaintiff) (internal quotation marks and citation omitted)).  Consequently, EM's Motion to Compel Arbitration and Stay These Proceedings Pending Arbitration is denied to the extent that the issue must proceed to a jury trial in accordance with §4 of the FAA.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT.**  In addition to asserting that she never received the October 2012 e-mail about implementation of the ADR Policy,[13] Stirrup argues that the "blast" e-mail in this case did not provide sufficient notice. Plaintiff cites cases where courts have found insufficient notice when employees were notified of arbitration agreements via e-mail.  (Plaintiff's Supplemental Brief (Doc. 26) citing *Campbell v. General Dynamics Gov't. Sys. Corp.*  407 F.3d. 546 (1st Cir. 2005); *Hudyka v. Sunoco, Inc.,* 474 F.Supp.2d 712 (E.D. Pa. 2007)).  These cases, however, did not hold that mass e-mail notice of arbitration policies was insufficient in and of itself.  In fact, the First Circuit stressed that the use of mass e-mail is not determinative to the appropriateness of the notice.  *Campbell,* 407 F.3d at 556.  It was the content that rendered the notice insufficient in both *Campbell* and *Hudyka*.  *See e.g. Campbell,* 407 F.3d at 557; *Hudyka,* 474 F.Supp.2d at 716-17.  Like the Court in *Campbell,* this Court declines to hold

---

[13]  Stirrup also challenges the January 2013 blast e-mail referenced in Hunter's declaration.  As discussed *supra* that e-mail, alone, does not constitute sufficient notice of the ADR Policy under *Davis*.

that notice of an arbitration policy made by mass e-mail in and of itself is per se unreasonable and/or otherwise insufficient.

In challenging the sufficiency of notice, Stirrup relies heavily on *Campbell,* which she argues is indistinguishable from the instant case. (Doc. 26, p. 7). However, *Campbell* involved arbitration of claims under the American with Disabilities Act ("ADA"), and Stirrup's action does not. In the First Circuit, which decided *Campbell,* "[w]hen a party relies on the FAA to assert a contractual right to arbitrate a claim arising under a federal employment discrimination statute, the court must undertake a supplemental inquiry…" to determine whether "Congress, in enacting a particular statute, intended to preclude a waiver of a judicial forum for certain statutory claims." *Campbell,* 407 F.3d at 552. The First Circuit determined that "[t]he appropriateness of enforcing an agreement to arbitrate an ADA claim hinges on whether, under the totality of the circumstances, the employer's communications to its employees afforded 'some minimal level of notice' sufficient to apprise those employees that continued employment would effect a waiver of the right to pursue the claim in a judicial forum." *Id.*; *see also Kummetz v. Tech Mold Inc.,* 152 F.3d 1153, 1155 (9th Cir. 1998) (an agreement to arbitrate disputes arising under the ADA or Title VII "must at least be knowing, which means that []the choice must be explicitly presented to the employee and the employee must explicitly agree to waive the specific right in question.[]") (internal quotation marks and citation omitted). In contrast, *Davis* where the ADA was not at issue, the Ninth Circuit found notice was reasonable where the employer sent a letter notifying the employee that modifications had been made and included a copy of the alternative dispute resolution policy and the arbitration provision. *Compare with Hudyka,* 474 F.Supp. 2d 712 (e-mail notice was insufficient where, *inter alia,* there was no evidence that employees received a copy of the policy). Because Stirrup does not advance a claim under the ADA or other federal employment discrimination statute, *Campbell* is distinguishable. *See e.g. Awuah v. Coverall North America, Inc.,* 703 F.3d 36, 45-46 (1st Cir. 2012) ("*Campbell* limited its holding to 'purported waiver[s] of the right to litigate ADA [Americans with Disabilities Act] claims.'") (citing *Campbell,* 407 F.3d at 559).

Stirrup also takes specific issue with the fact that EM used a link to provide access to the ADR Policy.  (*See e.g.* Doc. 31).  Certainly, an obscure link could tend to support a finding against the employer.  *See e.g. Campbell,* 407 F.3d at 548-49 (finding fault with link embedded at the bottom of the e-mail); *Specht v. Netscape Communications Corp.,* 306 F.3d 17, 23 (2d Cir. 2002) (declining to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen").  In addition to *Campbell* and *Specht,* Stirrup also cites the Ninth Circuit's recent decision in *Nguyen,* addressing agreements to arbitrate in the consumer context over the internet, which held that  even if a website uses a "conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."  *Nguyen,* __ F.3d. __, 2014 WL 4056549 at *6.  In contrast to the cases upon which Stirrup relies, the October 3, 2012 e-mail, which consisted of two paragraphs, reflects the link to the ADR Policy was by no means obscure, but was contained within the message language itself, appearing as the last sentence of the first paragraph:  "Please click here to access the ADR Policy."  (Doc. 10, Exh. 2, ¶3).  Upon clicking the link, the user would have access to the entire ADR Policy.  Moreover, EM also required employees to enter acceptance of the ADR Policy and employees were informed that the ADR Policy was a term and condition of continued employment.

Stirrup also argues, "[f]or notice of this importance, EM could or should have…used e-mail which it sent directly to the employee and then confirm receipt by requiring an e-mail response from the employee (which EM did not do, and EM has no e-mail confirmation from Stirrup)…."  (Doc. 26, p. 6).  Stirrup's suggested procedure for notice is essentially what EM contends occurred in this case.  First, as discussed *supra,* the case law does not reject notice merely because it was distributed by mass e-mail.  Further, EM did in fact require the employee to affirmatively "accept" the ADR Policy. *Compare Hudyka,* 474 F.Supp. 2d 712 (e-mail notice was insufficient where, *inter alia,* the employee was not required to manifest his intention to be bound by the agreement).

- 20 -

Requiring the employee to click on the "accept" box is akin to Stirrup's suggestion that the employee send an e-mail confirming receipt and acceptance, and Stirrup articulates no meaningful difference between the two methods.[14]   The procedure employed by EM in October 2012 case is not significantly different from the process Stirrup suggests constitutes adequate notice.

Stirrup submits her sworn statements that she never received the e-mail, she never was informed about the ADR Policy while working at EM, and that she was not at her computer when the e-mail was sent and when an acceptance was entered using her password and unique user name.  Stirrup also states that other EM employees had access to her computer log-in information, though she provides no motive why these employees would access her e-mail in October 2012 and enter her acceptance of the ADR Policy.

While all inferences are to be drawn in EM's favor as the non-moving party responding to Stirrup's motion, EM must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. EM has produced evidence that management had "significant discussions around the topic of ensuring…that the ADR Policy was distributed to *all* employees' e-mail addresses."  (Doc. 18, Exh. 2, ¶2) (emphasis in original).  In furtherance of that goal, Thalman wrote the program that would send the e-mail to all Art Institute employees on October 3, 2012.  (Doc. 10, Exh. 2, ¶3).  EM has submitted copies of screen shots, which Thalman attests are true and accurate, indicating that Stirrup's unique user name and password were entered from AiTU's IP network

---

[14] Stirrup has not pointed to binding authority supporting the conclusion that for notice to be valid in the employment context, the employee must indicate his or her acceptance of the provision.  For example, in *Davis*, there was no mention of any such acceptance on the employee's part.  Nor was the employer required to inform the employee that continued employment constituted acceptance.  *Davis*, 755 F.3d. at 1094.  Stirrup cites *Nguyen v. Barnes & Noble, Inc.*, __ F.3d. __, 2014 WL 4056549, which held that notice of an arbitration provision was not sufficient in the context of consumer transactions over the internet where the website did not provide notice to users of the term nor prompted users to take any affirmative action to demonstrate assent.  *Ngyuen* may be distinguished because it does not involve the employment context.  Moreover, because EM did require the employee to indicate acceptance, whether assent is required for notice to be reasonable is not at issue here.

address, in order to: (1) access the ADR Policy acceptance page; and (2) place a check mark in a box indicating the ADR Policy was accepted. (*Id.* at ¶¶4-5 (internal exhs. A,B).

As discussed, *supra,* EM also challenges Stirrup's ability to recall events by submitting Fulmer's declaration that she did not send Stirrup the employee handbook, as Stirrup contends, but, instead, Fulmer sent Stirrup the Code of Conduct.  (Doc. 18, Exh. 3, ¶5; *see also id.* internal Exh. A (e-mail correspondence from Fulmer to Stirrup)).

Drawing all inferences in favor of EM supports the conclusion that EM has pointed to evidence that calls Stirrup's credibility into question.  Credibility determinations are the province of the trier of fact.  Consequently, EM has set forth facts upon which a rational jury might return a verdict in its favor based on the evidence.  *See T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Assoc.,* 809 F.2d 626, 631 (9th Cir. 1987) (citing *Anderson,* 477 U.S. at 257).  As such, Stirrup's MPSJ is denied.

**ARIZONA'S ELECTRONIC TRANSACTION ACT.**  Stirrup also argues  that the October 3, 2012 e-mail failed to comply with the Arizona Electronic Transactions Act ("AETA"), A.R.S. § 44-7001, *et seq.*  (Doc. 12, pp. 7-8).  AETA provides in pertinent part:

> If the parties to a transaction have agreed to conduct the transaction by electronic means and a law requires a person to provide, send or deliver information in writing to another person, the requirement is satisfied if the information is provided, sent or delivered, as the case may be, in an electronic record that is capable of retention by the recipient at the time of receipt. An electronic record is not capable of retention by the recipient if the sender or the sender's information processing system inhibits the ability of the recipient to print or store the electronic record.

A.R.S. §44-7008(A).  There is no showing that the e-mails sent by EM failed to comply with AETA.  EM submits Castle's declaration statement that "Ms. Stirrup was able to retain, print, and store a copy of the ADR Policy and the screen confirming her agreement to the ADR Policy if she chose to do so."  (Doc. 18, Exh. 4, ¶6). Stirrup cites four additional requirements:  (1) the recipient must be given an opportunity to print out and be provided with a hard copy; (2) the employee must be informed of the hardware and software required to access and receive such information; (3) the employee must be informed how to withdraw consent to receiving documents in electronic form; and (4) the

- 22 -

1    employee must be told how to obtain a hard copy of the electronic document.  (Doc. 12, p.

2    7).  EM correctly asserts that these four "requirements" are not found in AETA.  (Doc. 18,

3    p. 9).  Stirrup fails to establish a genuine issue of material fact on this issue and her MPSJ

4    as it pertains to AETA is denied.

5    **PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

6         Stirrup argues that her claims are not subject to arbitration in light of the Dodd-

7    Frank Act.  In 2010, Congress passed the Dodd–Frank Act which, in part, amended the

8    Sarbanes–Oxley Act ("SOX") to bar the arbitration of whistleblower claims.    *Wong v.*

9    *CKX, Inc.,* 890 F.Supp.2d 411, 421 (S.D.N.Y. 2012).  In light of that amendment, SOX

10   now provides:

11        No predispute arbitration agreement shall be valid or enforceable, if the
          agreement requires arbitration of a dispute arising under [the Sarbanes–
12        Oxley whistleblower protection provision].

13   *Id.* (quoting 18 U.S.C. § 1514(e)(2)).  SOX sets out "six categories of employer conduct

14   against which an employee is protected from retaliation for reporting: violations of 18

15   U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1344 (bank fraud), § 1348 (securities

16   fraud), any rule or regulation of the SEC, or any provision of Federal law relating to fraud

17   against shareholders." *Lockheed Martin Corp. v. Administrative Review Bd., U.S. Dep't.*

18   *of Labor,* 717 F.3d 1121, 1130 (10th Cir. 2013) (discussing 18 U.S.C. § 1514A(a)(1)).The

19   Ninth Circuit has made clear that "[a] plaintiff seeking whistleblower protection under

20   SOX must first file an administrative complaint with OSHA…" not later than 90 days

21   after the date on which the violation occurs. *Coppinger-Martin v. Solis,* 627 F.3d 745,

22   749(9th Cir. 2010); *see also Lockheed Martin Corp.,* 717 F.3d at 1128, (plaintiff bringing

23   claim under SOX first filed administrative complaint with OSHA); *Wong,* 890 F.Supp.2d

24   411 (same).

25        Stirrup argues that her claims are protected under SOX because they "contain all

26   the elements of at least three of the specific offenses listed in 18 U.S.C. [§] 1514A(a)…",

27   such as: 18 US.C. § 1341 (frauds and swindles); 18 U.S.C. § 1343 (wire fraud); and 18

28   U.S.C. § 1344 (bank fraud—"student loans from banks based upon misrepresentations by

EM"). (Plaintiff's Second Motion for Partial Summary Judgment ("MPSJ2") (Doc. 23), pp. 4-8). However, Stirrup also asserts that she was not required to exhaust administrative remedies under SOX, because she "does not present any claim under SOX; her Complaint plainly states she is seeking relief solely upon her claims for relief for (1) Discrimination (constructive discharge) in violation of the False Claims Act, 31 U.SC. [§] 3730(h), and (2) and [w]rongful termination of employment…in violation of Arizona law." (MPSJ2 Reply (Doc. 29), p. 2; *see also id.* at pp. 3-5).

The Dodd-Frank Act amended the whistleblower provisions of SOX. *James v. Conceptus, Inc.,* 851 F.Supp.2d 1020, 1029-30 (S.D. Tex. 2012) "Dodd-Frank did not similarly amend the False Claims Act's antiretaliation provision under which [Plaintiff] sues." (*Id.*). ("Dodd–Frank's antiarbitration amendments to other statutes cannot be extended by implication to the antiretaliation provisions of the False Claims Act, especially when Dodd–Frank amended other parts of the False Claims Act but not the provision at issue.") "When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *Id.* at 1030 (quoting *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009)). Stirrup has framed her claims under the False Claims Act and Arizona law. As such, her claims do not qualify for the Dodd-Frank antiretaliation amendment to SOX, and Plaintiff's MSPJ2 arguing otherwise is denied.

**CONCLUSION**

Stirrup has presented evidence sufficient to establish a genuine issue of material fact so as to defeat EM's Motion to Compel Arbitration and to require a jury to determine whether a valid arbitration agreement exists. Likewise, EM has presented evidence sufficient to establish a genuine issue of material fact so as to defeat Stirrup's Motion for Partial Summary Judgment on the issue of whether a valid arbitration agreement exists. Additionally, Stirrup fails to establish that she is entitled to summary judgment under Arizona's Electronic Transaction Act or the Sarbanes-Oxley Act. Therefore, Plaintiff's motions for partial summary judgment are denied.

Accordingly, IT IS ORDERED that:

(1)     Defendants' Motion to Compel Arbitration and Stay These Proceedings Pending Arbitration (Doc. 10) is DENIED to the extent that the matter must proceed to jury trial on the issue whether a valid arbitration agreement exists;

(2)     Plaintiff's Motion for Partial Summary Judgment (Doc. 12) is DENIED; and

(3)     Plaintiff's Second Motion for Partial Summary Judgment (Doc. 23) is DENIED.

IT IS FURTHER ORDERED that this matter is SET for a status conference **THURSDAY, OCTOBER 16, 2014 AT 1:45 P.M.** in Courtroom 5F.

Dated this 16th day of September, 2014.


CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE